Opinión disidente emitida por la
Jueza Asociada Señora Fiol Matta.
La Opinión que hoy emite el Tribunal debilita la política pública constitucional y estatutaria a favor de la organiza-ción sindical y la negociación colectiva, pues por primera vez en la historia de nuestro ordenamiento laboral, se co-loca a un trabajador sindicalizado en una posición peor a la que tendría si no se hubiera organizado. Para ello, la ma-yoría se embarca en una senda de naturaleza, más que textualista, incomprensiblemente literal, que provoca un resultado absurdo contrario a lo previsto por la Asamblea Legislativa. Al así hacer, olvida que todo texto tiene su con-texto y que los tribunales tenemos el deber de interpretar las leyes teniendo en mente cuál fue el mal social que la Rama Legislativa quiso atender. En este caso, al aferrarse al texto de una porción de la ley, el Tribunal transforma el esquema legislativo diseñado para disminuir la brecha en-tre los empleados públicos no unionados y los que se han organizado sindicalmente. Desvirtúa de esa forma el pro-pósito mismo de la negociación colectiva, que es, en pocas palabras, establecer las condiciones jurídicas para que los trabajadores puedan conseguir colectivamente más de lo que tendrían individualmente.
Coincido con la mayoría del Tribunal en su discusión sobre la figura de la unidad apropiada, su conclusión de que un trabajador se considerará “sindicalizado” cuando la unión que lo representa haya sido certificada, indepen-dientemente de si se ha firmado un convenio colectivo, así como su análisis general sobre los convenios colectivos y los empleados gerenciales. De igual forma, coincido con su conclusión de que el foro con jurisdicción en este caso es la Comisión de Relaciones del Trabajo en el Servicio Público. Pero disiento enérgicamente de su conclusión de que el au- *33 mentó trienal establecido por la Ley Núm. 184-2004 para los empleados no unionados o gerenciales no aplica a aque-llos trabajadores sindicalizados que aún no han alcanzado su primer convenio colectivo y, por lo tanto, aún están en la misma posición que sus contrapartes no unionadosX([1])
I
Mediante el Artículo 8(8.3) de la Ley Núm. 184 (3 L.P.R.A. sec. 1464b), la Asamblea Legislativa atendió un problema muy particular, que sirve de eje a todo el es-quema retributivo en dicho estatuto: la creciente brecha entre la remuneración recibida por los trabajadores sindi-calizados y la que reciben los empleados no unionados en las agencias del gobierno central. Partiendo de la premisa de que un trabajador sindicalizado tiende a recibir mayo-res beneficios económicos que un empleado no unionado, la Legislatura quiso evitar que esa diferencia fuese tan mar-cada como para constituir una injusticia salarial para los servidores públicos que, por la razón que fuese, no se hu-bieran organizado sindicalmente y negociado colectiva-mente. Para ello, la Asamblea Legislativa adoptó un reme-dio muy específico: otorgar un aumento de cinco por ciento del salario a aquellos empleados públicos no sindicalizados o gerenciales que hubiesen ocupado un puesto regular du-rante un período ininterrumpido de tres años de servicio, sin haber recibido algún otro aumento de sueldo. ([2])
Según este esquema, los trabajadores sindicalizados re-cibirían sus aumentos salariales como producto de sus ne-gociaciones que culminarían en un convenio colectivo vin-culante, mientras que los empleados no unionados recibirían un aumento mínimo de cinco por ciento en un *34 periodo de tres años por gracia legislativa. Evidentemente, el diseño legislativo tenía como punto de partida la diferen-cia entre el salario de un trabajador sindicalizado y el de un empleado no unionado; premisa que no opera en el caso de autos, pues aquí ambos grupos de trabajadores están en la misma posición salarial, ya que los empleados sindicali-zados aún no han podido negociar su primer convenio colectivo.![3]) De igual forma, el vínculo estrecho entre la Ley Núm. 184 y la Ley Núm. 45-1998, estatuto que extendió el derecho de organizarse sindicalmente y negociar colectiva-mente a los empleados del gobierno central,![4]) confirma que el fin deseado por la Asamblea Legislativa era acortar la distancia que pudiera existir, en términos salariales, en-tre el empleado no unionado y el trabajador sindicalizado.
Lo anterior surge con claridad del historial legislativo de la Ley Núm. 184, así como de la intención legislativa que se expresa en la Exposición de Motivos![5]) de la forma siguiente:
Mantenemos presente que la negociación colectiva afectará la retribución de alrededor del 75% de los empleados públicos. Este número es sustancial y repercutirá en la retribución del 25% de los empleados que son excluidos de la Ley Núm. 45. Desde tal perspectiva, es imprescindible diseñar un sistema retributivo en consonancia con la Ley Núm. 45 y el presu-puesto del Estado Libre Asociado de Puerto Rico, de manera que la Autoridad Nominadora de cada agencia, donde los em-pleados hayan optado por la negociación colectiva y se hayan organizado sindicalmente, pueda mantener la uniformidad y justicia al momento de implantar los procesos retributivos, *35 tanto para los empleados sindicados como los no sindicados, incluyendo a los gerenciales.([6])
Esta expresión de la voluntad legislativa fue una cons-tante en el desarrollo de la Ley Núm. 184, tal y como se deduce del historial previo a su aprobación final, particu-larmente el “Informe en torno al Sustitutivo al P. de la C. 3844”. Según éste:
La negociación colectiva impacta directamente el sistema re-tributivo y afectará la retribución de alrededor del 75% de los empleados del sector público. Este número es sustancial y ten-drá un efecto en la retribución del 25% de los empleados que son excluidos de la Ley Núm. 45 del 25 de febrero de 1998. En ese sentido, se hace indispensable diseñar un sistema retribu-tivo en consonancia con la Ley Núm. 45 ....([7])
Es decir, la Asamblea Legislativa diseñó el Artículo 8(8.3) de la Ley Núm. 184 muy cuidadosa y deliberada-mente, identificando claramente dos hechos importantes. En primer lugar, el que una gran cantidad de empleados públicos se organizarían sindicalmente al amparo de la Ley Núm. 45 y que estarían, eventualmente, amparados por un convenio colectivo. En segundo lugar, que se produ-ciría una brecha salarial entre estos empleados y aquellos trabajadores que no se beneficiarían de un contrato colec-tivo, ya fuese porque eran gerenciales y no podían organi-zarse sindicalmente o porque optaran por no ejercer ese derecho estatutario. Por lo tanto, para lograr un balance entre la realidad salarial de estos servidores públicos, la Asamblea Legislativa estableció el aumento trienal. De esa manera, los empleados no unionados no quedarían en una posición demasiado distante de sus compañeros servidores públicos organizados sindicalmente.([8]) Esto, como parte de *36 un esquema amplio que actualizó el sistema de personal en el gobierno central de manera que se atendiera la brecha aludida. Según surge del “Informe en torno al Sustitutivo”, luego de la aprobación de la Ley Núm. 45 “[s]e hizo nece-saria una revisión de todos los aspectos del sistema de personal para restablecer el principio de mérito y proponer un esquema retributivo moderno, justo, equitativo y armoni-zado con la negociación colectiva”.([9]) Es decir, hacía falta atender el sistema de retribución ante el hecho de que, a partir de ese momento, muchos empleados públicos se or-ganizarían sindicalmente y recibirían mayores beneficios producto de la negociación colectiva.
No podemos minimizar la amplitud del esquema legis-lativo aprobado en la Ley Núm. 184. Se trata de un acer-camiento abarcador al tema de la retribución en el empleo público. El Artículo 8(8.3) atiende específicamente la dife-rencia entre trabajadores sindicalizados y empleados no unionados en el gobierno central. El historial legislativo demuestra que el estatuto es parte de un andamiaje más amplio que incluye la disminución de la brecha salarial existente en otras áreas. A modo de ejemplo, el “Informe en torno al Sustitutivo” expresa que “[o]tra consideración que dio margen al desarrollo de estas leyes [de personal] fue la diferencia substancial entre los salarios del sector privado y las corporaciones públicas frente a los que recibían los empleados públicos en el gobierno central”.([10]) En otras pa-labras, mientras se atendía la diferencia salarial entre em-pleados del gobierno central y los demás sectores de nues-tra economía, al interior del gobierno central también se *37 atendió la brecha entre los empleados sindicalizados y los no unionados. Ese mismo informe manifiesta que “[el] sis-tema de retribución debe proveer mecanismos justos tanto para el personal no sindicado y excluido, como para el personal sindicado que se atiende mediante la negociación colectiva” .([11])
Evidentemente, la Asamblea Legislativa identificó la desigualdad entre un trabajador sindicalizado con un sala-rio más alto, producto de la negociación colectiva, y un em-pleado no unionado. Más aún, la ley presupone, en todo momento, que se ha llevado a cabo una negociación colec-tiva que produce un salario mayor. Zanjar esta desigual-dad entre el producto de la negociación colectiva y el pro-ducto de los planes administrativos de retribución es el propósito expreso del Artículo 8(8.3). No obstante, la ma-yoría invierte el diseño legislativo de manera que el traba-jador sindicalizado que aún no ha podido negociar su primer convenio colectivo queda en peor posición que si no se hubiese sindicalizado.
Esto es totalmente incongruente con nuestro ordena-miento laboral. Nuestra jurisprudencia ha reconocido con-sistente y reiteradamente que, mediante la organización sindical y la negociación colectiva, un trabajador puede quedar en mejor posición, pero nunca en una peor que si no se hubiese sindicalizado.([12]) No podemos pasar por alto *38 que, si a un empleado ordinario le aplican todas las gracias legislativas, las que quedan incorporadas automática-mente en todo contrato de trabajo([13]) independientemente de la existencia de un convenio colectivo, y el patrono tiene una obligación estatutaria de negociar de buena fe, no es posible que un empleado sindicalizado quede en peor posi-ción que si no se hubiera sindicalizado.
II
La situación que nos presenta el caso de autos no fue anticipada por la Asamblea Legislativa cuando aprobó la Ley Núm. 184. Se trata de un grupo de servidores públicos del gobierno central que ha ejercido su derecho a organi-zarse sindicalmente y a negociar colectivamente con miras a producir un primer convenio colectivo. Dicho proceso de negociación aún no había culminado cuando solicitaron el aumento trienal, al que tenían derecho todos los empleados que, como ellos, llevaban tres años sin aumento salarial. Es cierto que los demandantes son trabajadores sindicali-zados, lo cual, si nos aferremos al texto, parecería excluir-los del alcance del Artículo 8(8.3) de la Ley Núm. 184. Ahora bien, como hemos visto, la razón de la exclusión no fue el hecho de la sindicalización, sino que la legislatura presumió que los empleados estarían cobijados por un con-venio colectivo que ofrecería mejores beneficios y condicio-nes, y por eso no necesitarían el aumento trienal. Es decir, que estarían en mejor posición que los empleados no unio-nados, a quienes se les otorgaría el referido aumento para *39 acercarlos a la situación salarial de los trabajadores sindicalizados. Resulta incontrovertible que la Asamblea Legislativa no anticipó una situación en la que el aumento trienal resultara en una mejor posición para el empleado no unionado frente al trabajador sindicalizado, pues tal desenlace contradice la esencia misma de la negociación colectiva y derrotaría la política pública constitucional y estatutaria en favor de dicho proceso.
En ese sentido, coincido plenamente con la conclusión del Tribunal de Apelaciones en este caso, que señala acer-tadamente que el elemento fundamental en esta controver-sia es que estos empleados públicos, aunque se han sindi-calizado, aún no han logrado su primer convenio colectivo. Por lo tanto, aún no han podido conseguir beneficio mayor alguno al establecido por la vía legislativa. Ahora, según la Opinión mayoritaria, tampoco podrán recibir el aumento trienal de la Ley Núm. 184. Como correctamente expresó el foro apelativo: “El fin de la negociación colectiva es conse-guir mayores beneficios para los empleados unionados que los que proveen las leyes aplicables, las que usualmente proveen beneficios mínimos que, de ordinario, son mejora-dos mediante la negociación colectiva. ... Lo contrario sería colocar a estos empleados en un limbo laboral durante el periodo entre la certificación de la Unión como represen-tante exclusivo y la fecha de la ratificación del primer con-venio colectivo”.([14])
En este caso no hace falta ignorar el texto de la ley con el fin de “cumplir su espíritu”.([15]) Se trata de identificar cuál fue el mal social que la Asamblea Legislativa preten-dió atender al aprobar este esquema retributivo, de ma-nera que no se produzca un resultado absurdo y diametral-mente contrario a lo anticipado por la Legislatura. Como adelantara, no estamos ante una situación prevista por la *40 Asamblea Legislativa. Más bien, se trata de una situación anómala. Los empleados públicos no unionados, así como los gerenciales, reciben un aumento salarial producto de la gracia legislativa plasmada en la Ley Núm. 184. Por su parte, los trabajadores sindicalizados que ya gozan de un convenio colectivo vigente están cobijados por las condicio-nes allí establecidas. Son los trabajadores sindicalizados que aún no han negociado su primer convenio los que que-dan en el “limbo”.
Ante esta situación, el Tribunal tenía dos opciones. En primer lugar, negarle a los demandantes el aumento trie-nal establecido por el Artículo 8.3 de la Ley Núm. 184 y dejarlos en una posición peor que la que hubiesen tenido si no se hubiesen sindicalizado. La mayoría ha escogido esta opción. En sentido contrario, el Tribunal podría reconocer que se trata de un caso anómalo y extender el aumento a estos trabajadores, de manera que no se produzca lo que la Legislatura quiso evitar. Desafortunadamente, la mayoría se aferra ciegamente a las palabras escuetas de la ley, pro-duciendo un resultado contrario al propósito legislativo, trastornando nuestro ordenamiento laboral y derrotando nuestra política pública. Nuevamente, son los servidores públicos los que sufren las consecuencias de nuestros errores. Disiento.

(1) 3 L.P.R.A. see. 1461 et seq.

(2) Artículo 8.3 de la Ley Núm. 184-2004 (3 L.P.R.A. sec. 1464b(3)).

(3) Este hecho es altamente significativo, pues hay una diferencia notable entre estos trabajadores y aquellos empleados sindicados cuyas negociaciones están aún en proceso, pero ya están cobijados por un convenio colectivo anterior.

(4) 3 L.P.R.A. see. 1451 et seq. Véase Exposición de Motivos de la Ley Núm. 184, supra, 2004 (Parte 1) Leyes de Puerto Rico 1122, 1124-1125.

(5) La Opinión mayoritaria hace referencia “tanto [al] texto como [al] historial” de la ley para fundamentar su conclusión, pero obvia el objetivo legislativo que surge de ese mismo historial en cuanto a acortar la brecha salarial entre los empleados públicos. Opinión mayoritaria, pág. 23. En ese sentido, la mayoría comete el error de leer el Artículo 8(8.3) aislándolo de su propósito.

(6) (Énfasis suplido). Exposición de Motivos de la Ley Núm. 184, supra, pág. 1126.

(7) (Énfasis suplido). Informe en tomo al Sustitutivo al P. de la C. 3844 de 15 de julio de 2004, pág. 6.

(8) Esta realidad se puede observar a través de todo el historial legislativo de la Ley Núm. 184. Véase Informe en torno al Sustitutivo al P. de la C. 3844, págs. 4-7. *36 El informe utiliza expresiones como “establecer un sistema de personal compatible y armonizable con la negociación colectiva en la parte del sector público donde existía” (íd., pág. 4), en esa ocasión, en el contexto de las medidas legislativas previas a la aprobación de la Ley Núm. 45-1998. Es decir, se han vinculado consistentemente los sistemas retributivos amparados en las leyes de personal con la negociación colectiva. En otras partes del historial se hace constante referencia a conceptos como “equidad salarial". íd., pág. 5.

(9) (Énfasis suplido). íd., pág. 7.

(10) (Énfasis suplido). íd., pág. 5.

(11) (Énfasis suplido). íd., pág. 7.

(12) Véase, por ejemplo, C.O.P.R. v. S.P.U., 181 D.P.R. 299 (2011). En ese caso, resolvimos que un árbitro que atendía una controversia sobre despido injustificado, al amparo de un convenio colectivo que establecía que debía ser interpretado y apli-cado conforme a derecho y que callaba en cuanto a los poderes remediales del árbitro, no podía dar más del mínimo aplicable a los trabajadores no unionados cobijados únicamente por la legislación protectora del trabajo. En ese contexto, manifestamos que “[e]sto es cónsono con la política pública a favor de la negociación colectiva, ya que son las partes y no el árbitro o los tribunales las que han pactado adherirse a lo mínimo que ofrece nuestro ordenamiento jurídico, sin más”. (Énfasis en el original suprimido y énfasis suplido). Id., pág. 335. De esta manera reconocimos que un trabajador organizado siempre estará protegido, mínimamente, por los beneficios otorgados a los empleados no unionados. En C.O.P.R. v. S.P.U., supra, expresamos que “[l]a Ley Núm. 130 [de Relaciones del Trabajo] concede al patrono y a la unión la oportunidad de ensanchar la protección mínima que ofrece la Ley Núm. 80 .... Me- *38 diante la negociación colectiva, las partes pueden pactar en el convenio que el em-pleado reciba mayores beneficios y protecciones con relación a su seguridad de empleo”. (Énfasis suplido). íd., pág. 338. En varias ocasiones en ese caso hicimos referencia a que mediante convenio se puede ampliar “más allá de lo mínimo”. Id. Véase Opinión disidente de la Jueza Asociada Señora Fiol Matta, pág. 353. Además, en J.R.T. o. Vigilantes, Inc., 125 D.P.R. 581 (1990), resolvimos que un contrato labo-ral, ya fuese colectivo o individual, siempre puede dar más que lo establecido por gracia legislativa, pero nunca menos.

(13) J.R.T. v. Vigilantes, Inc., supra, pág. 592.

(14) Sentencia del Tribunal de Apelaciones, págs. 13-14; Apéndice de la Petición de certiorari, págs. 29-30.

(15) Opinión mayoritaria, pág. 26.